# Case No. 22-1232

To be argued by
Jeffrey Chabrowe

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

DOCKET No. 22-1232

———————

United States of America,

Appellee,

v.

Olalekan Daramola, AKA Sealed Defendant 2, Solomon
Aburekhanlen, AKA Sealed Defendant 3, Gbenga Oyeneyin, AKA
Sealed Defendant 4, Abiola Olajumoke, Sealed Defendant 5, Bryan
Eadie, AKA Sealed Defendant 7, Albert Lucas, Sealed Defendant 8,
Ademola Adebogun, Sealed Defendant 9, Lucas Ologbenla, Adewole
Taylor, Curlten Otidubor, Temitope Omotayo, AKA Sealed Defendant
6,

Defendants,


Oluwaseun Adelekan, AKA Sealed Defendant 1,

Defendant - Appellant.

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

———————

BRIEF FOR DEFENDANT-APPELLANT OLUWASEUN ADELEKAN

———————

JEFFREY CHABROWE, ESQ.
Law Offices of Jeffrey Chabrowe
521 Fifth Avenue, 17th Floor
New York, NY 10175
(917) 529-3921
Attorney for Defendant-Appellant Oluwaseun Adelekan

# Table of Contents

Jurisdictional Statement ............................................................................. 1

Issues ....................................................................................................... 1

Factual Background.................................................................................... 1

A.  Personal  History ............................................................................ 1

B.  The Instant Case............................................................................. 3

C.  The Trial Below ............................................................................. 4

D.  Sentencing .................................................................................... 12

Summary of Argument ............................................................................ 16

Argument ................................................................................................ 16

A.  The lower court abused its discretion in admitting tax returns when it admitted highly prejudicial personal tax records that were not probative of guilt or innocence.................................................................................................. 16

B.  The court below abused its discretion by permitting an IRS employee to testify as a fact witness. .......................................................................... 20

C.  Mr. Adelekan's sentence was procedurally unreasonable because there were no facts adduced to support an intended loss figure of $9.5 million.............. 22

Conclusion .............................................................................................. 28

# Table of Authorities

**Cases**

*Gall v. United States,* 552 U.S. 38, 49-51 (2007) ........................................................................22, 27

*Peugh v United States*, 569 US 530, 541 (2013)....................................................................................28

*Rita v. United States,* 551 U.S. 338 (2007) ..........................................................................................22

*Torres v. United States*, 140 F.3d 392, 404 (2d Cir. 1998) ..................................................................24

*United States v Barbera*, 2022 US Dist LEXIS 140172 (SDNY Aug. 5, 2022),.................................19

*United States v. Bergstein*, 788 F. App'x 742 (2d Cir. 2019) ...........................................9, 11, 19, 20

*United States v. Black, No. 13-CR-316 (DLI), 2014 U.S. Dist. LEXIS 156884, 2014 WL 5783067 (E.D.N.Y. Nov. 5, 2014),* ....................................................................................................................................19

*United States v. Brady*, 417 F.3d 326 (2d Cir. 2005).............................................................................23

*United States v. Cabrera*, 13 F.4th 140 (2d Cir. 2021).........................................................................22

*United States v Campo Flores*, 945 F3d 687 (2d Cir 2021)..................................................................22

*United States v. Chu*, 714 F.3d 742 (2d Cir. 2013)...............................................................................23

*United States v. Cuti*, 720 F.3d 453 (2d Cir 2013) ................................................................10, 11 20, 21

*United States v. Deutsch*, 987 F.2d 878 (2d Cir. 1993).........................................................................27

*United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001) ..........................................................................17

*United States v. Doe*, 938 F.3d 15, 19 (2d Cir 2019) ............................................................................24

*United States v Donoteo-Reyes*, 2022 U.S. App. LEXIS 2179 (2d Cir Jan. 25, 2022, No. 20-2564).............23

*United States v Dorvee*, 616 F.3d 174 (2d Cir 2010)............................................................................23

*United States v Khalil*, 214 F.3d 111 (2d Cir. 2000).............................................................................16

*United States v Kurland*, 2022 US Dist LEXIS 121821 (EDNY July 8, 2022, No. 20-CR-306 (S-1) ...........20

*United States v. Moyhernandez,* 5 F.4th 195 (2d Cir. 2021), *vacated on other grounds,* 142 S. Ct. 2899 (2022)......................................................................................................................................................23

*United States v Osarenkhoe*, 439 F. App'x 66 (2d Cir. 2011),.............................................................21

*United States v. Paulino*, 445 F.3d 211 (2d Cir. 2006) ..................................................................8, 9, 18

*United States v. Pruitt*, 813 F.3d 90 (2d Cir. 2016) ..............................................................................26

*United States v. Rea*, 958 F.2d 1206 (2d Cir. 1992) ..............................................................................18

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007),............................................................................22

*United States v Robinson*, 2017 US Dist LEXIS 166117 (SDNY Oct. 5, 2017, No. 17-CR-249 (PAE)........18

*United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012)........................................................................23

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) (*per curiam*)...................................................17

*United States v. Samas*, 561 F.3d 108 (2d Cir. 2009) ...........................................................................23

*United States v Shellef*, 507 F3d 82 (2d Cir 2007)...............................................................................18

*United States v Stanley*, 12 F3d 17 (2d Cir 1993)................................................................................27

*United States v. Tarricone*, 996 F.2d 1414 (2d Cir. 1993),..............................................................8, 17

*United States v. Tucker*, 404 U.S. 443 (1972) ......................................................................................24

*United States v. Valenti*, 60 F.3d 941 (2d Cir. 1995) ...........................................................................19

*United States v. Williams*, 247 F.3d 353 (2d Cir. 2001) .......................................................................27

*Yates v. Evatt*, 500 U.S. 391 (1991) ......................................................................................................18

**Statutes**

18 U.S.C. § 1349 ......................................................................................................................................iv

18 U.S.C. § 1028A ...................................................................................................................................13

18 U.S.C. § 3553(a)(1)............................................................................................................................23

18 U.S.C. § 3553(a)(2)............................................................................................................................23

18 U.S.C. § 3553(a)(5)............................................................................................................................23

18 U.S.C. § 3553(a)(6)............................................................................................................................23

18 U.S.C. § 3742(a).................................................................................................................................iv

28 U.S.C. § 1291 .....................................................................................................................................iv

Rules

§ 2B1.1(b)(1)(K). ................................................................................................................ 13

§ 2B1.1(b)(1). ..................................................................................................................... 27

§ 2B1.1(b)(2)(A)(i) ............................................................................................................. 13

§§ 3B1.1(a) and 3C1.1 ........................................................................................................ 13

Fed. R. Evid. 403 ............................................................................................................ 21, 22

Fed. R. Evid. 404 ...................................................................................................... 19, 20, 21

Fed. R. Evid. 701 ............................................................................................................ 21, 22

Fed. R. Evid. 702 ............................................................................................................ 21, 22

# Jurisdictional Statement

Appellant Oluwaseun Adelekan ("Mr. Adelekan") was charged on May 23, 2019 in the U.S. District Court for the Southern District of New York with conspiracy to commit and attempted wire fraud, and aggravated identify theft, in violation of 18 U.S.C. § 1349 and 1028B. Superseding Indictments were filed on August 2, 2019, and September 9, 2021, adding a money laundering conspiracy count (18 U.S.C. 1956(h)). The trial was conducted on October 20, 21, 22, and 25, 2021. The jury returned a guilty verdict on October 26, 2021. On May 25, 2022, the lower court sentenced Mr. Adelekan to 84 months on the wire fraud and money laundering counts, and a consecutive 24 months on the aggravated identify theft charge. Mr. Adelekan filed timely notices of appeal on June 3 and June 8, 2022. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

# Issues

(1) Whether the trial court abused its discretion by admitting prejudicial evidence and permitting an expert to testify as a fact witness.

(2) Whether the trial court committed procedural error in sentencing Mr. Adelekan based on an intended loss without any fact findings behind it.

# Factual Background

## A. Personal History

Oluwaseun Adelekan was born on June 20, 1982, in Nigeria, one of three born to

Oluwaseun Adelekan Senior and to Idowu Loukemi.[1] He and his family moved to the U.S. in May 1999. His father left the family household two years after they entered the United States, leaving his mother as sole provider for the family. Ms. Loukemi, age 63, lives in Maryland and operates a day care center. She has diabetes and hypertension. The two sisters are identical twins, both working as registered nurses. Another sister is still in school. Mr. Adelekan became a United States citizen on September 7, 2007. Between 2014 and 2018, Mr. Adelekan resided between Texas and the Bronx. In about 2010 or 2011, he married but divorced a year or two later. In 2015, Mr. Adelekan married again, and also divorced one year later.

Mr. Adelekan has one son, Oluwaseun Adelekan, age seven, who lives in Albany, NY with his mother. A second son, Jeremiah Ansah, age four, lives with his mother. in Manhattan. Mr. Adelekan also has a daughter, Eyinogoluwa Melanie Adelekan, age three, who lives in Brooklyn with her mother. Mr. Adelekan maintained regular contact with all three children and provided financial support for them.

In 2015, Mr. Adelekan was diagnosed with diabetes, and in 2021, with hypertension. He has received hospital care and medication for both.

Mr. Adelekan graduated from St. Francis Academy, located in Nigeria and upon moving to the Bronx, attended a final year of high school here. From 2000 through 2005, he attended City College of Manhattan, and earned a bachelor's degree in

---

[1] The personal background is taken from the Pre-Sentence Report, submitted separately, and from the Defense Sentencing Memorandum, in the Attachment ("A") at A139-150.

computer graphics. He participated in an apprenticeship program for masonry at Local 79 Union, Long Island City, New York, and in 2019, became certified in asbestos removal/air sampling.

Since 1999, Mr. Adelekan has bought and sold automobiles, purchasing used vehicles at automobile auctions, repairing then selling them. He earned between $2,500 and $3000 per month. Since 2009, he has been a self-employed contractor for New York City Messenger, making deliveries for CVS Pharmacy. In 2020, he earned approximately $125,000. Post arrest, he was employed at Adeliade Environmental Services in Brewster, New York, and earned $25 per hour as a project manager. He also worked on the side to promote lounges catering to persons of African descent in New York.

B. <u>The Instant Case</u>

Mr. Adelekan and eleven other defendants were indicted in the Southern District of New York on one count of wire fraud, one count of conspiracy to commit money laundering and four counts of aggravated identify theft. He was arrested on April 25, 2019 and released on bond. Multiple superseding indictments issued through September 2019. A11-25. The charges centered on an alleged fraud scheme whereby at least 10 victims were bilked of millions of dollars through different email scams designed to trick them into collectively wiring millions of dollars into bank accounts controlled by members of the scheme. The scheme primarily involved three types of fraud: (1) business email compromises; (2) romance scams; and (3) Russian oil

scams. Each of these scams involved convincing a victim to wire money under false pretenses. Bank accounts were opened in the name of shell companies to receive the funds.

Mr. Adelekan's conviction rested on the use of business emails. The defendants obtained illegal access to business email accounts, slightly altered the email address and sent an email posing as that user, to convince a colleague of that user to send large amounts of moneys to various accounts.

C. The Trial Below

Mr. Adelekan proceeded to trial. Opening statements occurred October 18; witnesses testified October 20, 21, 22, 25 and 26, 2022. The jury returned a guilty verdict on October 26. A46-47.

Government witnesses included persons who had received false business emails and sent, or almost sent, funds to one of the accounts maintained by defendants. These victims or targets described having received emails that appeared to be from colleagues, or clients, requesting a transfer of funds to a specified account. Most often the transfers were made, with the victims later discovering fraud. Most victims acknowledged they did not know who sent the emails and could not identify the defendants as having done so. A128-129.

Two cooperating witnesses (Bryan Eadie and Solomon Aburekhanlen) testified. Eadie described having met Mr. Adelekan in 2017, and spending time with him at Mr. Adelekan's home. A65-94. Eadie was interested in a possible business

investment with Adelekan. They communicated often on WhatsApp. Eadie described the nicknames of people holding distinct functions in the scheme. Eadie described his role as a "scouter," someone who found individuals willing (for a fee) to make their existing or newly established business bank accounts available for receipt of the fraudulently obtained funds. A "plug," for example, was the computer operator orchestrating the fake electronic communication with the victim. The "connect" communicates among the different participants, including providing the "breakdown" -- text messages describing how to distribute the funds that arrived by transfer. Eadie stated Mr. Adelekan was a "connect." Often account transfers had to be made quickly before an account would be frozen for suspicious activity. Sometimes banks required additional information to validate a transfer. The "connect" provided those details. Sometimes Eadie would provide Mr. Adelekan with verification of transfers. This information came primarily from Eadie's review of his WhatsApp messaging with Mr. Adelekan. Eadie also recited how events transpired as investigation unfolded in the case. Eadie acknowledged his other criminal history, and that his cooperation in this case was intended to help him with another pending charge. A82. He acknowledged having provided false information in the past to authorities. A85; A92.

Aburekhanlen also testified as a cooperating witness. A94-121. He ran, among other things, an asbestos removal service. He met Mr. Adelekan at a club, who inquired about a loan. Mr. Adelekan described how he needed access to a business account; Aburekhanlen feared it was illegal activity. He described using his business

account to receive transferred funds, and then to transfer them per directions from Mr. Adelekan. He reviewed his business account activities, describing deposits and receipts having nothing to do with his actual asbestos business. He reviewed bank interactions with banks from whom he was receiving wire transfers, and the fabricated business detail he would provide to substantiate the transfer. Sometimes he had to do so in person. Mr. Adelekan provided him these details; on one occasion, Aburekhanlen kept some funds for himself which were not intended for him. This caused a falling out between them. When his first account was closed for suspicious activity, he opened another. He did this six times. He also solicited other persons for access to their accounts. He also described his criminal history (insurance fraud), and cooperation. Aburekhanlen even put out feelers to set up his own scheme.

Both Eadie and Aburekhanlen testified they were aware Mr. Adelekan ran a car business, buying old vehicles, rehabilitating, and then reselling them. A89-90; A118-119. They at times accompanied him to auctions. They at times sent monies to Mr. Adelekan's car business account; they acknowledged there was a market for used cars in Nigeria. Aburekhanlen invested in Mr. Adelekan's car business. Some of the funds they received went to Mr. Adelekan's car business account. Aburekhanlen went to the car auction and paid for a car for Mr. Adelekan once. Neither investigated the entities to whom the transfers were made.

One government witness who engendered controversy was an IRS employee, Thomas Bolus. On October 19, the parties discussed before the court the

government's last minute delivery of information the night before. A57-60.

Particularly disturbing to the defense was defendant personal tax information the

government indicated it intended to put on. The defense maintained it would have to

hire a tax expert to properly respond to the individual tax returns and other

information the government wanted to introduce. The defense sought, but did not

obtain, a continuance to review this information. The defense stated:

> I don't know if the government plans to introduce that evidence as evidence of
> tax fraud or tax -- my client is not charged, neither is Mr. Kluger's client
> charged, with a tax violation or filing fraudulent tax returns, and so I would
> object entirely to the tax records coming in, and I raise that objection.

A59. The parties agreed to postpone a decision until the government sought to

introduce it if it did. The court stated:

> I guess we can talk about this later, but I seem to recall, from the government's
> papers, an argument — and I'm sure they'll correct me if I am wrong here — to
> the effect that if the profits from the charged scheme were not declared on the
> tax return, that might be evidence of guilty intent. If they were, that might be
> something else. Mr. Wolf, am I right on that?
> MR. WOLF: That's exactly right.

Id. Counsel for Mr. Adelekan submitted written objections on October 20, stating:

> The contents of Mr. Adelekan's personal tax returns for 2018 and 2019 – the
> only records that the Government has disclosed to the Defense as of the date of
> this letter -- have no bearing on his guilt or innocence of the wire fraud, money
> laundering, and aggravated identity theft charges for which he is on trial. The
> proffered evidence and testimony should be excluded as irrelevant, immaterial,
> and confusing to the jury under Federal Rules of Evidence 401, 402 and 403.

A61. He also argued:

> Further, "when a defendant 'unequivocally' relies on a defense that he 'did not
> do the charged act at all, . . . evidence of other acts is not admissible for the

purpose of proving [the] intent' or knowledge with which he acted." *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) (quoting *United States v. Tarricone*, 996 F.2d 1414, 1421-22 (2d Cir. 1993) (internal quotation marks omitted)). The question of whether or not Mr. Adelekan filed truthful and accurate personal income tax returns has no bearing on the charge that the Government seeks to prove through their introduction. The personal tax records do not prove anything about the contents of Mr. Adelekan's business tax returns or even whether such returns were filed.... the Government seeks to have the jury make at least three improper inferences from the proffered personal tax records: First, that the contents of the personal returns are false declarations of income; second, that the personal tax returns prove that Mr. Adelekan intended to conceal income to his business because he knew that it came from illegal activity; and third, that Mr. Adelekan would have filed personal tax returns with higher reported income, had his business income been legitimate. None of these inferences find support in the documents.

As to the first improper inference, to determine whether or not the personal tax returns contain material misstatements, the Defense would need to hire a tax expert … to assess Mr. Adelekan's income for the years in question and to review the filings. Taking the time to hire a tax expert now (even if we could find one on no notice), in the middle of a trial that is anticipated to last only a few more days, would inevitably delay the proceedings and inconvenience the Court and the members of the jury.

As to the second, the personal tax records show nothing about the income to Mr. Adelekan's business or whether it was accurately accounted for on business tax returns....

[O]n the final point, the tax returns simply have nothing probative to add to the case. Filing a tax return with materially false information, including the failure to report earned income, is a separate crime having to do with the *reporting* of the income but saying nothing as to the *source* of that income.....

Quite simply, Mr. Adelekan asserts only that he was not one of the individuals who committed wire fraud. He maintains that he bought and sold used cars at auction to be repaired and shipped to Nigeria at the request of individuals in that country who had eager customers lined up. He did not hack emails. He did not initiate fraudulent correspondence or misdirect wire transfers. His defense is "unequivocally . . . that he did not do the charged act at all." Thus, other act evidence, even assuming, *arguendo*, that Mr. Adelekan's personal tax returns are materially false in some aspect, is inadmissible under the law of this Circuit to prove "the intent or knowledge with which he acted." *Paulino*, 445 F.3d at 221.

A62-64.

The defense motion was argued October 21, as the government sought to put on the tax evidence through IRS employee Bolus. A122-127.

> [Defense Counsel]: There are two personal tax returns for Mr. Omotayo as well, and because this case deals with businesses and income flowing to and out of business accounts, it's the defense's position that this personal income tax information is irrelevant and immaterial and confusing to the jury. So, we are asking that the Court not permit that evidence or those exhibits.
> Mr. Wolf: [R]eturn information is admissible both as intrinsic evidence to the money laundering charge or as other act evidence reflecting of the defendant's intent with respect to all counts or any of the other counts….think the Court has now seen, and certainly we would proffer and plan to admit evidence to this point, the bank accounts that the defendants had in connection with the criminal conduct that we allege, were sole proprietorship bank accounts.

A122. The government indicated its IRS witness was intended as a fact witness explaining "with respect to sole proprietorships, income is declared on a personal income tax return with a schedule C.…" Id. Therefore, the premise of the defense argument was wrong. The government cited to *United States v. Bergstein*, 788 F. App'x 742 (2d Cir. 2019), upholding admission of tax returns to show that shell companies under defendant control did not report income or pay taxes. A122. Other circuit cases, the government argued, have held that evidence of failure to report significant sums of money in tax filings is relevant as to money laundering. A123. Lastly, the government argued that it did not intend to qualify its IRS witness as an expert, and therefore the defense was not prejudiced by short notice. The government claimed the *Bergstein* decision expressly approved of the tax agent testifying as a fact witness (relying on *United States v. Cuti*, 720 F.3d 453, 458 (2d Cir 2013). This was

because the witness "reasoning was based on undisputed accounting rules." Id. The government also noted that the defense could have easily reviewed tax returns with their clients on their own initiative during the pre-trial period. Id.

The defense rebutted that, should the IRS employee be deemed an expert they would not have had the opportunity to respond. Id. It claimed the IRS employee could only be testifying as an expert because he is testifying as to what income must be reported, which is a highly complex issue. Id. The defense had not examined tax returns with their clients because it was not a tax case. A124. The court suggested these were undisputed accounting rules. Id. Mr. Adelekan's counsel stated:

> I don't know the tax laws well enough, to know that I would be asking a witness all of the relevant questions. So in order to make sure that I was properly and adequately representing my Mr. Adelekan, I believe that I would need an opportunity to speak with someone who could advise me as to those matters, and that would be even assuming that the witness testified as a fact witness…But the defendants' position is that he did have a legitimate business and that he did do things and incur business expenses — he bought cars, he sold cars, he repaired cars, he spent money on shipping, on repairs, on parts, on storage. So it's not clear that all of the money coming in, in in any event, would have to be declared on any kind of tax return, even if it's on sole proprietorship and should be declared on a personal return.

Id.

The court stated that the defense should have been on notice of the tax issue when it got the government's subpoena two weeks earlier for personal returns. Id. Because it was not a tax case, the defense did not believe personal tax returns would be relevant. Id. It reiterated its position the IRS witness was an expert witness and should be qualified as such. A125. Any defense case, the defense argued, could be

deemed to have tax ramifications and that as CJA attorneys it is a complex process to

obtain an expert. A126. The case relied on by the government held the accounts were

a fact witness because they participated in that specific case. Id.

The court stated:

Counsel, it seems to me that *United States v. Bergstein*, 788 F. App'x 742 (2d Cir. 2019), is directly on point. There, an IRS agent testified, obviously not the person who prepared the defendant's taxes. The Court there found that the agent's testimony with respect to what was reported and what was not reported demonstrated the defendant's intent and the absence of mistake. Accordingly, it was relevant. Here, in addition, it seems that the testimony will be direct evidence of the concealment of the source of the funds, that is, direct evidence on the concealment/money laundering charge. With respect to lay testimony or expert testimony, the Court of Appeals in *Bergstein* found that the agent did not improperly testify as an expert witness when, among other things, he identified which required records the agency lacked and explained certain basic concepts. That's what I understand the agent will be doing here, in that he will be testifying as to what was reported. He will be testifying that certain returns were not filed, and will be testifying on certain basic concepts, specifically that the income of a sole proprietorship should be reported on one's personal income tax return. As I understand it from counsel, that is a black-and-white rule, available on the IRS's website. In *Bergstein*, the Court of Appeals relied on *United States v. Cuti*, 720 F.3d 453, 458 (2d Cir. 2013), noting that the accountant's testimony was proper fact opinion and not expert testimony, in part, because the witness' reasoning "was based on undisputed accounting rules." That is what I understand the situation to be here. Accordingly, I will permit the testimony.

A127. The court further concluded the defense was not provided with late notice

because it had notice of the subpoenas and in a money laundering case, it would be

reasonable to review tax returns. It therefore permitted the IRS testimony. Id.

IRS Administrative Staff Person Thomas Bolus testified on Oct 23. A130-138.

He worked in the IRS Criminal Investigation Division. He coordinates IRS

involvement with federal criminal trials. He had reviewed the tax returns for both defendants for the years 2016 to 2019. He reviewed what income was required to be reported. He reviewed what a sole proprietorship is, and how they are required to report earnings through a Schedule C and how the Schedule C totals are reported on the main return, the 1040. He reviewed how individuals can amend a return later. He reviewed the specific returns for both defendants or documentation if a return had not been submitted. A summary had been made of their returns. Bolus reported Mr. Adelekan did not report any income for 2016 or 2017. He did report income for 2018 - $13,545, though without a Schedule C. and $7,128 for 2019. No income was reported for Mr. Adelekan's car business, Olad Trading. He acknowledged the IRS would not necessarily know if the reported income included all income actually made, nor expenses incurred. He did not know if Mr. Adelekan had ever filed an amended return. There was no particular way a person, especially a person newly arrived in the U.S., would know when a Schedule C was required.

The defense did not put on a case-in-chief.

D. <u>Sentencing</u>

The Pre-Sentence Report ("PSR") issued on May 11, 2022. It noted the three counts: conspiracy to commit wire fraud, money laundering and aggravated identify theft, and the offense conduct of all the related defendants. The PSR found over $6 million in loss had occurred during the entirety of the offense. Mr. Adelekan was deemed to have willfully attempted to impede justice by stating to coconspirator

Aburekhanlen, and having communicated to him, that all would be OK, and he should not speak with the government. PSR ¶ 63.

Counts 1 and 2 were grouped under § 3D1.1, using money laundering as the higher offense level. The base offense level was 7. The PSR identified Mr. Adelekan as responsible for at least $9,500,000 in loss, equaling a 20 level increase under USSG § 2B1.1(b)(1)(K). More than 10 victims generated another two levels (§ 2B1.1(b)(2)(A)(i)), producing a base offense level of 29. Specific offense characteristics added two levels under § 2S1.1(b)(2) (for an 18 USC § 1956 conviction) and two levels for sophisticated means (§ 2S1.1(b)(3)). Mr. Adelekan was found to be an organizer/leader and having obstructed justice. Six additional points were added (§§ 3B1.1(a) and 3C1.1). An adjusted offense level of 39 resulted. Mr. Adelekan did not receive acceptance of responsibility credit. Having no prior offenses, he was in Criminal History Category I. Count 3 mandated under 18 USC 1028A a consecutive two-year sentence.

The defense filed a Sentencing Memorandum and Exhibits on May 19, 2025. A139-152. It highlighted Mr. Adelekan's otherwise law-abiding life, his support of his family and community members, and his efforts to secure a good education and rise socially and economically, to overcome the hardships of his youth in Nigeria. He stood in as the main support and father figure of his family unit after his father deserted the family after relocating to the U.S. Almost fifty letters of support had been submitted to the court from family, friends, coworkers, people incarcerated with

Mr. Adelekan, and letters from people back in Nigeria.

The defense specifically objected to the $9,500,000 intended loss figure as unduly excessive. A144-145. It objected to the managerial enhancement, noting that the scheme overall was much larger in scope than the aspect Mr. Adelekan was involved with. A145. There was evidence the co-defendants had stolen funds from Mr. Adelekan and were setting up their own organization. The defense also objected to the Obstruction of Justice enhancement as based on inaccurately reported facts. Id. The defense sought a variance from the guidelines because the guideline level, in particular the loss amount, was unduly harsh. Mr. Adelekan had a pristine background, and the guideline imposed a sentence well beyond that needed to satisfy the statutory sentencing factors. With his specific background, he was highly unlikely to recidivate. A sentence of 48 months was requested as adequate deterrence.

The government concurred with Probation that a sentence variance from the guideline range was justified. A153. It reviewed Mr. Adelekan's specific conduct: recruitment of other participants to open accounts and coordinating deposits, transfers, opening new accounts, and responding to bank inquiries. The government asserted Aburekhanlen's testimony that a third party told him Mr. Adelekan had said not to talk with the government demonstrated Mr. Adelekan's obstruction of justice. A160-161. The government reviewed the scope of the entire conspiracy, and statistics about the world-wide impact of this class of

scams as warranting deterrence. A162. The government noted that, relative to the sentence received by Mr. Adelekan's co-defendant, he should receive custodial sentence below the guideline. A162-163.

Mr. Adelekan was sentenced on May 25, 2022. A164-170. Defense counsel asserted the facts did not support an organizer enhancement. The court found the organizer and obstruction enhancements warranted. Defense specifically objected to the increase of the loss amount from $6 million to $9.5 million. A166. The court referred defense counsel to the list of victims at ¶ 62 of the PSR, which totaled $6 million. Id. The defense acknowledged that list was accurate but argued the total actual loss figure disproportionate to harm. A166. The government asserted the intended loss figure of 9.5 million was "faithful to the evidence that the government has received and also shared with defense counsel." Id. The court replied: "based on the evidence adduced at trial, I find that the increase set forth in Paragraph 69 is appropriate as a measure of the intended loss." Id. The court denied any acceptance of responsibility credits. A166. It accepted the PSR guideline calculation finding a total offense level of 39 and Criminal History Category I. A167. After listening to the defense and to Mr. Adelekan directly the court imposed a variance sentence of 108 months – 84 months on counts 1 and 2 concurrently, and 24 consecutive months on count three. Forfeiture amount of $6,158,562.60 and a restitution amount of $6,123,861.55 were imposed. A169-170.

## Summary of Argument

The lower court abused its discretion in admitting Mr. Adelekan's tax records and permitting the testimony of an IRS witness not properly certified as an expert admission of IRS, an abuse which substantially prejudiced the defendant. Mr. Adelekan's sentence was procedurally unreasonable when there were no factual findings, or any evidence adduced, to support an intended loss calculation of $9.5 million, which figure underpinned the entire guideline calculation.

## Argument

A. <u>The lower court abused its discretion in admitting tax returns when it admitted highly prejudicial personal tax records that were not probative of guilt or innocence.</u>

The district court wrongfully permitted the government to introduce evidence of Mr. Adelekan's personal tax returns because their prejudicial value far outweighed any probative purpose.

Trial court evidentiary rulings are reviewed for abuse of discretion. See *United States v. Khalil*, 214 F.3d 111, 122 (2d Cir. 2000) (recognizing trial courts' broad discretion to decide evidentiary issues). To find such abuse, the trial judge's evidentiary rulings must be found "arbitrary and irrational." *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001) (internal quotation marks omitted); *United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1998) (*per curiam*), cited in *United States v Paulino*, 445 F3d 211, 217 (2d Cir 2006).

The defense noted clearly that whether or not Mr. Adelekan filed truthful and

accurate personal income tax returns was irrelevant to the charges. They proved

nothing about Mr. Adelekan's business tax return filings. They proved nothing about

the validity of the business income Mr. Adelekan said asserted was in his account

transfers. Nor did they prove anything or even whether such returns were filed. The

personal tax returns were irrelevant to whether Mr. Adelekan conspired with others to

receive monies into his Olad Trading business bank account to which he was not

entitled.

Mr. Adelekan asserted as his defense that his involvement with the charged

conduct all related to his car business activities. Proof of uncharged crimes or bad

acts "is not admissible to prove the character of a person in order to show action in

conformity therewith." Fed. R. Evid. 404(b). When a defendant "unequivocally"

relies on a defense that he "did not do the charged act at all, . . . evidence of other acts

is not admissible for the purpose of proving [the] intent" or knowledge with which he

acted. *United States v. Tarricone*, 996 F.2d 1414, 1421-22 (2d Cir. 1993), cited in

*United States v Paulino*, 445 F3d 211, 221 (2d Cir 2006).

Here, it cannot be concluded that this error was "'unimportant in relation to

everything else the jury considered on the issue in question, as revealed in the

record.'" *United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992), quoting *Yates v.

Evatt*, 500 U.S. 391, 403 (1991). See *United States v Paulino*, 445 F3d at 219. It was

error to admit such evidence for an issue no longer in dispute. *United States v. Scott*,

677 F.3d 72, 83 (2d Cir. 2012) (finding abuse of discretion under Rule 404(b) in

admitting evidence to show identity where identity was not in dispute), cited in

*United States v Robinson*, 2017 US Dist LEXIS 166117, at *5 (SDNY Oct. 5, 2017,

No. 17-CR-249 (PAE)).

Here, the vast body of the government's case involved Mr. Adelekan's

communications with the two cooperating witnesses as to account transfers. Yet these

two witnesses openly acknowledged they were fully aware of Mr. Adelekan's car

business, they assisted him with that business by visiting auction houses, delivering

payments to auction houses, and paying for repairs and rehabilitation. A89, A119.

Yet the evidentiary value of this testimony was completely undercut by admission of

the personal tax documents. It was an abuse of discretion that was material in this

case. See *United States v Shellef*, 507 F3d 82, 101 (2d Cir 2007) (introducing "other

acts" tax records in non-tax case improperly suggests defendant is predisposed to

engage in a particular type of criminal activity). See Fed. R. Evid. 404(b) (providing

that other-acts evidence "is not admissible to prove the character of a person in order

to show action in conformity therewith"). As this Court stated in *Shellef*, "The risk is

that the jury would reason that if [the defendant] was willing to lie to the IRS..., he

would be willing...to lie to others,.... [it allows inference of] general mendacity

relevant to the remaining counts and thereby discount his testimony unrelated to the

tax counts." Id.

*United States v. Bergstein,* relied on by the lower court, is inapposite. Unlike Mr.

Adelekan, the defendant there was not contesting that the alleged offense conduct had

occurred, but merely the legitimacy of the funds. In *United States v. Valenti*, 60 F.3d 941, 946 (2d Cir. 1995). In *United States v Barbera*, 2022 US Dist LEXIS 140172, at *22-24 (SDNY Aug. 5, 2022), tax return evidence was admissible. There, however, the trial court had expressly excluded the evidence unless the defendant claimed entitlement to the stolen funds – which he ultimately did. In *United States v Kurland*, 2022 US Dist LEXIS 121821, the returns were admissible only because the court gave a limiting instruction to the jury.

Relevant is the evidentiary rule under which the returns are introduced. The court here did not clarify if the returns were being admitted as direct evidence or prior bad acts under 404(b). In *United States v. Bergstein*, 788 F. App'x at 745, the court admitted the tax returns under Rule 404(b) because they showed "intent and absence of mistake." In *United States v. Valenti*, 60 F.3d at 946,  the returns were properly admitted under Rule 403 but the court did not address whether they was admitted as direct evidence or as Rule 404(b) evidence). In *United States v. Black*, No. 13-CR-316 (DLI), 2014 U.S. Dist. LEXIS 156884, 2014 WL 5783067, at *4-*5 (E.D.N.Y. Nov. 5, 2014), the court was persuaded by other circuits that had found that "failure to report significant sums of money in tax filings is relevant to, and evidence of . . . participation in a money laundering conspiracy," but nonetheless "conducted an analysis under 404(b), as an alternative basis" because the issue had not been decided by the Second Circuit. For that reason, in *United States v Kurland*, *supra*, at *22-23 (EDNY July 8, 2022, No. 20-CR-306 (S-1) (NGG)], the court declined to find that

the tax returns were admissible as direct evidence of the charged conduct but admitted it under 404(b). Here, the court did not acknowledge whether the returns were admitted as direct evidence or evidence of other crimes and did not conduct the balancing test it would be required to do under the latter. Moreover, in *Kurland*, the court found the 403 balancing warranted admission precisely because a limiting instruction was given – which did not occur here.[2]

B. <u>The court below abused its discretion by permitting an IRS employee to testify as a fact witness.</u>

Relatedly, the lower court abused its discretion by permitting IRS employee Bolus to testify as a fact witness. The government argued, and the court agreed, that *United States v. Bergstein*, *supra,* permitted the witness' testimony as a fact witness because the accounting rule were uncontested. But the holding in *Bergstein*, relying on *United States v Cuti*, 720 F3d 453, 457-458 (2d Cir 2013), is in fact more nuanced. In Bergstein, the unreported income was directly attributable to the defendant; here, income allegedly unreported by Mr. Adelekan was only attributable to him by inference, rendering less inculpatory any failure to report. Moreover, in *United States v Cuti*, on which *Bergman* relied, a substantial foundation had been laid for the

---

[2] "Of course, the returns are still also subject to Rule 403 balancing. This type of evidence—suggesting that Kurland committed not only a bad act but possibly also another uncharged crime—invites a meaningful possibility of prejudice. The jury might conclude that if Kurland was willing to lie to the IRS, he would be willing to lie to others, *i.e.*, the Lottery Victims. *See United States v. Shellef*, 507 F.3d 82, 101 (2d Cir. 2007). However, in *Shellef* and other cases, the court has found that a limiting instruction is sufficient to cure such prejudice. *See id.*; *Osarenkhoe*, 439 F. App'x at 68 ('[T]the probative value of the tax return was not substantially outweighed by any prejudice to the defendant, particularly because the district court gave the jury a limiting instruction at the time the evidence was introduced.')." *United States v Kurland,* 2022 US Dist LEXIS 121821, at *26-27 [EDNY July 8, 2022, No. 20-CR-306 (S-1) (NGG).

accountants' testimony, who were familiar with the specific transactions at issue:

> Each was a certified and experienced accountant personally familiar with the accounting of the transactions at issue. The hypothetical questions utilized facts that had been independently established in the record. If the facts as the witnesses had understood them were *A* and the true facts were *B*, it was not inappropriate to ascertain, from the very witnesses responsible for their accounting, whether *B* would have affected that accounting under the same, undisputed accounting rules. And, since the applicable accounting rules were explained in detail, the reasoning process that the witnesses employed in answering the hypotheticals was straightforward and transparent to the jurors, who could readily discern whether the responses given were reliable.

*United States v Cuti*, 720 F3d at 458. The narrow set of facts justifying the accountants' testimony in *Cuti* are very different from those in the instant case.

Moreover, the defense counsel here received no advance notice that an IRS employee was going to testify, and the tax records introduced. They learned the day before trial was to start. As defense counsel noted repeatedly, they had no opportunity to consider the records and obtain contrasting evidence, and they asked for a continuance. In contrast, in *United States v Osarenkhoe*, 439 F. App'x 66 (2d Cir. 2011), defense counsel had had a week's advance notice and had never asked for a continuance.

The government here was obligated to comply with Rule 702, which it did not. The opinions here were anything but ordinary everyday knowledge: "If the opinion rests in any way upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701." Id. (quotation omitted). Accordingly, lay opinion testimony is "limited to opinions that

result from a process of reasoning familiar in everyday life." *United States v Campo Flores*, 945 F3d 687, 707 (2d Cir 2021), quoting *United States v. Cuti*, 720 F.3d t457 and cited in *United States v Cabrera*, 13 F.4th 140, 149. Expert and lay opinion cannot be conflated. *United States v Campo Flores*, 945 F3d at 707. Testimony that is rooted in specialized knowledge is not lay or the basis for fact testimony. *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007), cited in *United States v Marsh*, 568 F App'x 15, 17 (2d Cir 2014). Virtually everything Mr. Bolus testified to was based on specialized knowledge. It required qualification under Rule 702.

The confluence of these evidentiary errors substantially influenced the verdict. It vitiated Mr. Adelekan's ability to establish his receipt of funds related wholly to his legitimate business activities. *United States v Cabrera*, 13 F.4th at 151.

C. Mr. Adelekan's sentence was procedurally unreasonable because there were no facts adduced to support an intended loss figure of $9.5 million.

The Guidelines are "a starting point and an initial benchmark" for imposing a reasonable sentence. *See, Gall v. United States,* 552 U.S. 38, 49-51 (2007); *Rita v. United States,* 551 U.S. 338, 347-351 (2007). But they are not presumptively reasonable. Under § 3553(a)'s "parsimony clause," it is the sentencing court's duty to "impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth" at 18 U.S.C. § 3553(a)(2). *United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009). Those purposes are: "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C.

§ 3553(a)(1), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), and the Guidelines themselves, 18 U.S.C. § 3553(a)(5). *United States v Dorvee*, 616 F.3d 174, 182-183 (2d Cir 2010).

Appellate review of reasonableness requires assessment whether procedural errors occurred, and whether the sentence is substantively reasonable under the totality of the circumstances. It is a deferential, abuse of discretion review. *United States v Donoteo-Reyes*, 2022 U.S. App. LEXIS 2179, at *2 (2d Cir Jan. 25, 2022, No. 20-2564). But "discretion has limits," and "sound legal principles must guide discretion." *United States v. Moyhernandez,* 5 F.4th 195, 205 (2d Cir. 2021), *vacated on other grounds,* 142 S. Ct. 2899 (2022).

A sentence is procedurally unreasonable when it is based on clearly erroneous facts or inadequately explained. *United States v. Robinson*, 702 F.3d 22, 38 (2d Cir. 2012); *United States v. Chu*, 714 F.3d 742, 746 (2d Cir. 2013); *United States v. Brady*, 417 F.3d 326, 332-33 (2d Cir. 2005)(district court abuses the discretion when its decision rests on "a clearly erroneous factual finding"). Sentencing procedure must satisfy due process rights. *Torres v. United States*, 140 F.3d 392, 404 (2d Cir. 1998). Those rights are compromised when a sentence is "founded at least in part upon misinformation" or misapprehension of the facts. *United States v. Tucker*, 404 U.S. 443, 447 (1972); *United States v Doe*, 938 F.3d 15, 19 (2d Cir 2019)

Here, Mr. Adelekan's sentence was based on a loss calculation that had virtually

no evidentiary support. At no point in the trial was any evidence adduced to show an intended loss of $9.5 million. Nonetheless, the Pre-Sentence Report stated at ¶ 60:

> 60. During their involvement in the instant offense, TEMITOPE OMOTAYO and **OLUWASEUN ADELEKAN** are responsible for causing a loss of at least $9,500,000, which represents the ill-gotten funds **that were received from** at least 10 victims. OMOTAYO and **ADELEKAN** also held managerial roles in the offense in that they directed the actions of his co-conspirators regarding the commission of the instant offense. (emphasis added).

This paragraph refers to $9,500,000 as funds "received" from the victims – not as intended loss. But the actual itemization of loss – of funds received - appears at ¶ 62:

> 62. During the life of the instant offense, **OLUWASEUN ADELEKAN**, OLALEKAN DARAMOLA, SOLOMON ABUREKHANLEN, GBENGA OYENEYIN, ABIOLA OLAJUMOKE, TEMITOPE OMOTAYO, BRYAN EADIE, ALBERT LUCAS, ADEMOLA ADEBOGUN, LUCAS OLOGBENLA, ADEWOLE TAYLOR, CURLTEN OTIDUBOR are responsible for causing an **actual loss of least $6,178,562.60, which represents the ill-gotten funds received from below listed victims**. The following victims suffered losses as a result of the instant offense.... (emphasis added).

The Report then goes on to list the individual victims and loss figures, with that total of $6,178,562.60. But nowhere is there any calculation of how the $9,500,000 figure in ¶ 60 is arrived at. Nor is that number characterized in ¶ 60 as intended loss; it is characterized as funds received, which means it directly conflicts with ¶ 62.

The defense objected to the loss figure as excessive, although it stated Mr. Adelekan would be liable for intended loss. Sent Memo 6-7. The government asserted it had "identified losses attributable to the scheme of at least $6,178,562.60,

with an intended loss in excess of $9.5 million. (PSR ¶ 62.) ." A410. Of course, ¶ 62 does not calculate any intended loss but rather itemizes actual loss.

At sentencing, the court acknowledged the defense had an issue with the 20 level increase based on the amount of the fraud.

> Counsel, I wasn't entirely sure what the basis was for the objection to the 20-level increase on account of the amount of the fraud. What was the basis for that, please? MR. TILEM: Mr. Schechter can address that.
> THE COURT: Thank you. Mr. Schechter.
> MR. SCHECHTER: Yes, I think there's at issue, one, that 20-level increase sort of causes whether it is appropriate and whether that amount of loss is accurate. Originally, it was an allegation of 9 million, later decreased down to 6 million. A lot of that is a theoretical loss amount. And to have such a drastic increase, I don't think was the purpose of the guidelines. And what we have seen occurred throughout other sentencing situations is that these significant level enhancements don't match the crime, and the punishment is incredibly disproportionate. I don't believe that Mr. Adelekan ever received anywhere near the amounts in that, or even that the government was ever able to prove that total actual loss of 6 million.

A165-166, *passim*. The court replied that ¶ 62 lists $6,178,562.60 as the loss figure and asked defense counsel which amount he objected to. Defense counsel replied to Mr. Adelekan did not have actual or constructive knowledge, to which the court replied it was a conspiracy. Defense counsel replied, "to argue that his intended loss amount is over 6 million when there are people who operated even without him, and by their own admission, sort of cut him out of any sort of profit, I don't know how his loss amount should be increased because of that." The court replied: "this was not the test." The defense acknowledged it did not dispute the itemization in ¶ 62 setting forth actual loss.

The parties were clearly confusing  intended v. actual loss. The government

attempted to clarify:

> To the extent I think that the defense counsel is suggesting that something may
> be amiss here because the loss with respect to the guidelines is in excess of
> $9.5 million and the restitution is approximately $6.1 million, there's nothing
> amiss with that. I think as the Court pointed out, the difference in those two
> numbers is the difference between intended loss and actual loss. And the
> government's calculations are faithful to the evidence that the government has
> received and also shared with defense counsel.

A166.

The due process arises with that last sentence – for as far as can be ascertained,

there was never any evidence or calculations submitted that supported a loss figure

of $9,500,000. Not at trial, not with Probation, not at sentencing. It is a ghost

figure that by repetition took on actual shape.

This, however, is inadequate for sentencing purposes. The court has an

obligation to ensure the information it relies on for sentencing is accurate and

adequate to inform the process. A sentencing court may adopt the PSR findings

and sentence based thereon, but only if the PSR itself contains adequate findings.

*United States v. Pruitt*, 813 F.3d 90, 92 (2d Cir. 2016) ("the district court has

adopted the presentence investigation report in open court and the factual findings

in the report are adequate to support the sentence."). Guideline loss includes

intended, probable, or otherwise expected loss. *United States v Stanley*, 12 F3d 17,

21 (2d Cir 1993). Any reliance on intended loss requires factual findings to support

it. Id. It is well-established the burden is on the government to establish loss, both

the existence and amount of the loss. *United States v. Williams*, 247 F.3d 353, 358 n.7 (2d Cir. 2001). A court need only make a reasonable estimate of loss but cannot engage in pure speculation. *United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993).

Here, there were no findings anywhere to support an intended loss figure of $9,500,000. But the court applied a twenty level base offense increase based on it. If the actual loss figure of $6,178,562.60 had been applied, Mr. Adelekan's guideline would have been two levels less – an 18 level enhancement under §2B1.1(b)(1). His adjusted base offense level would have been 37, with a range of 210-262 months, not 262-327, and then the consecutive 24 months on the aggravated identify theft.

Mr. Adelekan received a variance sentence, but this fact does not render this error any less meaningful. The post-Booker sentencing regime requires calculation of the Guideline as its starting point; it is the essential framework for sentencing proceedings. ." *Gall v. United States*, 552 U. S. 38, 49 (2007). The Guidelines are to be the sentencing court's "starting point and . . . initial benchmark...Federal courts understand that they "must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Peugh v United States*, 569 US 530, 541 (2013). "Even if the sentencing judge sees a reason to vary from the Guidelines, 'if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the Guidelines are in a real

sense the basis for the sentence.'" Id., at 542. Improper calculation of a Guideline range is a "significant procedural error." *Gall, supra*, at 51. This significant procedural error occurred in Mr. Adelekan's case and is cause for resentencing.

## Conclusion

Based on the above, this Court should vacate Mr. Adelekan's conviction and sentence and remand the case for retrial in the lower court. In the alternative, it should remand for resentencing.

Dated:  March 18, 2024      Respectfully submitted,
      New York, NY

*Jeff Chabrowe*
JEFFREY CHABROWE, ESQ.
LAW OFFICES OF JEFFREY CHABROWE
521 Fifth Avenue, 17th Floor
New York, NY 10175
(917) 529-3921
*Counsel for Defendant-Appellant Oluwaseun Adelekan*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 8,691 words in this brief.

Dated:  March 18, 2024
        New York, New York

_Jeff Chabrowe_

JEFFREY CHABROWE, ESQ. (NY #3001328)
LAW OFFICES OF JEFFREY CHABROWE
521 Fifth Avenue, 17th Floor
New York, NY 10175
(917) 529-3921
*Counsel for Defendant-Appellant Oluwaseun Adelekan*